IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF WEST VIRGINIA AT WHEELING

*U.S. DISTRICT COURT*
*FILED AT WHEELING, WV*

*DEC – 2 2013*

*NORTHERN DISTRICT OF WV*
*OFFICE OF THE CLERK*

ROBERT B. YOE, PAUL MICHAEL YOE,
GLENDA STUART, JEANNINE SHOUP,
JOY MAYNARD, JEFFREY S. YOE, and
JAMES D. YOE,

        Plaintiffs,

v.

        CIVIL ACTION NO. 3:13-CV-173

\BRANCH BANKING AND TRUST
COMPANY, a North Carolina corporation,

        Defendant.

---

## PLAINTIFFS' COMPLAINT

Comes now the Plaintiffs, Robert B. Yoe, Paul Michael Yoe, Glenda Stuart, Jeannine Shoup, Joy Maynard, Jeffrey S. Yoe and James D. Yoe ("Beneficiaries") and file this Complaint against Branch Banking and Trust Company alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c), along with violations of West Virginia statutory and common law. In further support of this Complaint, Plaintiffs state as follows;

### FACTS

1.    Robert B. Yoe, son of Harry W. Yoe, currently resides at 507 South Lanvale Avenue, Daytona Beach, Florida.

2.    Paul Michael Yoe, son of Harry W. Yoe, currently resides at 3762 Mallory Court, Hillsborough, North Carolina.

3.      Glenda Stuart, employee of Harry W. Yoe, currently resides at 9801 Sailfish Terrace, Montgomery Village, Maryland.

4.      Jeannine Shoup, granddaughter of Harry W. Yoe, currently resides at 118 Venus Avenue, Winter Haven, Florida.

5.      Joy Maynard, granddaughter of Harry W. Yoe, currently resides at 326 Tennyson Road, S.E., Winter Haven, Florida.

6.      Jeffrey S. Yoe, grandson of Harry W. Yoe, currently resides at 100 Sandburg Lane, Winter Haven, Florida.

7.      James D. Yoe, grandson of Harry W. Yoe, currently resides at 4725 Gopher Street, Middleburg, Florida.

8.      The Plaintiffs are the residuary heirs and only remaining Beneficiaries of the Estate of Harry W. Yoe (Estate).

9.      Upon information and belief, the Defendant, Robert S. Hill, Jr., currently resides at 16 Files Crossroad, Martinsburg, West Virginia.

10.     Branch Banking and Trust Company (BB&T) is a North Carolina corporation, with its principal office located at 200 West Second Street, 3rd floor, Winston-Salem, North Carolina.

11.     BB&T conducts business throughout the Northern District of West Virginia including its office at 148 South Queen Street, Martinsburg, West Virginia.

12.     Yoe Properties, LLC, is a West Virginia limited liability company, with its principal office location at 201 North George Street, Suite 200, Charles Town, West Virginia.

13.     The Court has jurisdiction and venue over this matter as the majority of conduct, breaches of duties, concealments, and fraudulent representations occurred in the Northern District of West Virginia.

14.     The amount in controversy in this matter also allows this Court to have jurisdiction over this matter.

15.     State and federal courts share concurrent jurisdiction over Complaints alleging violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1964(c).  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that the Plaintiffs and Defendant are citizens of different states and the matter in controversy is greater than $75,000.00, exclusive of interest and cost.

THE FACTS

16.     Harry W. Yoe died testate on July 14, 2003.

17.     At the time of his death, Harry W. Yoe was the sole owner of approximately 336 acres of undeveloped farmland, including three residential structures and farm buildings in Berkeley County, West Virginia.  The Real Property consisted of Tax Parcels 18.1 (+/-152.5 acres), 18.2 (+/-91 acres) and 18.3 (+/-92.5 acres) (hereinafter "Yoe Farm").  The Yoe Farm is more particularly described and set forth in the Deed dated April 9, 2004, and recorded in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Deed Book 761, at Page 390.

18.     Pursuant to his Last Will and Testament, of record in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Will Book 92, at Page 619, Harry W. Yoe directed his Personal Representative to sell and liquidate the Real Property and bequeathed the net proceeds of his residuary estate, after two specific bequests, as follows: a). 25% to Robert B.

Yoe; b). 25% to Paul Michael Yoe; c). 25% to Glenda C. Stuart; d).  6.25% to James D. Yoe;  e). 6.25% to Jeannine E. Yoe; f). 6.25% to Joy Yoe Maynard; and g). 6.25% to Jeffrey S. Yoe.

19.     Robert S. Hill, Jr., was named as the Executor under Harry W. Yoe's Last Will and Testament ("Executor Hill").

20.     Upon information and belief, prior to officially qualifying as executor of the Estate, Executor Hill, met with officials at BB&T about becoming co-executors with him.  Specifically, upon information and belief, Executor Hill met with Stephen Grove of BB&T on July 15, 2003 and inquired about the Bank's assistance in administering the estate.

21.     Upon information and belief, on or around July 16, 2003 Executor Hill visited the Fiduciary Office in the Berkeley County Court House and attempted to have BB&T appointed as co-executors of the Estate, but the Berkeley County Fiduciary Office refused to certify BB&T as co-executors of the estate.  Executor Hill thus signed up to become the official executor of the Estate.  The Beneficiaries were not told that the Berkeley County Probate Court had refused to certify BB&T as co-executors.

22.     On or around July 21, 2003, Executor Hill entered into a "Schedule of Fees" with BB&T wherein Executor Hill "designate[d] Branch Banking and Trust Company to act as Agent" for the estate services as set forth in the Schedule of Fees agreement.

23.     In the Schedule of Fees, BB&T identified itself as a "Corporate Fiduciary," "co-executor," "co-fiduciary" and an "agent" of the Estate.

24.     During a meeting with the Beneficiaries and Executor Hill, Stephen Grove of BB&T represented that the Schedule of Fees was a contract establishing BB&T as co-executors with Executor Hill.

25.     On July 21, 2003 BB&T also entered into a Managing Agency Agreement with Executor Hill that entitled BB&T to, among other things, hold estate security and estate cash assets, accept income on the assets, pay expenses incurred in administering the account, and to employ persons to assist BB&T in the aforesaid activities.  In exchange for those services, the Schedule of Fees slated BB&T to receive compensation in the amount of Two and One-Half Percent (2.5%) of the value of the probate estate in 2005 and another Two and One-Half Percent (2.5%) of the "Real Estate Proceeds" minus the appraised value in 2007.

26.      On the Schedule of Fees, the value of the probate estate was estimated by BB&T in July 2003 to be "$3,095,359.00", and it was estimated on the Schedule of Fees that BB&T would receive a fee of $77,384.00 in 2005.

27.     The value of the total sales price for the Yoe Farm in the July 21, 2003 Schedule of Fees was predicted at Five Million Dollars and Zero Cents ($5,000,000.00).  BB&T thus estimated that it would receive a fee of Fifty Thousand Dollars ($50,000.00), or 2.5 percent of the Two Million Dollar difference between the expected sales price and the amount of the probate value.  It was estimated, upon information and belief, that the second fee would be collected by BB&T in 2007.

28.     Upon information and belief, Executor Hill believed that BB&T was acting as a co-executor of the estate when he entered into this agreement.  When asked to explain under oath what co-executor meant to him, Executor Hill claimed that it meant "we were in this together." Executor Hill also testified under oath that he signed a Contract establishing BB&T as co-executors.

29.     On or around July 25, 2003, Executor Hill and Stephen Grove from BB&T met with Beneficiaries Robert Yoe and Paul Michael Yoe at the Yoe Farm and explained BB&T's "role" and "intentions".  During that meeting and at various other times, Stephen Grove of BB&T advised

Robert Yoe and Paul Michael Yoe that BB&T was serving as "co-executor" on the estate alongside Executor Hill.

30.     Upon information and belief, BB&T thereafter began administrative actions as "co-executors" and/or "executor agents", including marketing the Yoe Farm, depositing and withdrawing money from Harry W. Yoe's existing BB&T account, Account Number 125004761 ("Estate Funds" or "Estate Account"), marketing the personal property of Harry W. Yoe, paying estate debts from the Estate Account, and assisting the Estate with tax-related services.

31.     As part of tax related services, on or before August 29, 2003, BB&T contracted with C. Michael Williams to perform an appraisal to "determine" the fair market value of the Yoe Farm.

32.     On September, 30 2003, upon information and belief, C. Michael Williams mailed to BB&T his appraisal report for the Yoe Farm.  In the Report, Appraiser Williams certified that the fair market value of the Yoe Farm as of July 14, 2003 was Three Million Dollars and Zero Cents ($3,000,000.00).  In the Report, Mr. Williams wrote "Agents for the current owner of the property indicate that two recent offers were made for the subject property at $2,500,000 and $3,000,000 respectively."

33.     Upon information and belief, the Butler Group had offered Harry W. Yoe Four Million Five Hundred Thousand Dollars (4,500,000.00) to purchase the Yoe Farm prior to his death.  Upon information and belief, BB&T concealed those offers from C. Michael Williams.

34.     Upon information and belief, BB&T paid C. Michael Williams One Thousand Dollars ($1,000.00) to perform his appraisal of the Yoe Farm using Estate Funds.

35.     Thereafter, Executor Hill advised the Beneficiaries, "[we] are in the process of considering the proposals of the two developers who are willing to pay cash up front.  These offers currently range between $4.1 million to $5 million.   We are working with Harry's attorney, Ken

Barton, who was investigating developers for Harry prior to his death. As soon as we have something more concrete, we will provide you with the details. It is my prayer that you all enjoy a blessed day."

36.    BB&T represented on numerous occasions to Executor Hill and the Beneficiaries that Attorney Kenneth Barton, Jr. ("Attorney Barton") of Steptoe & Johnson PLLC was acting on behalf of and for the Yoe Estate.

37.    On or about November 26, 2003, Stephen Grove of BB&T sent electronic mail to Executor Hill, Paul Michael Yoe, and Robert Yoe regarding potential buyers of the Yoe Farm.    In the e-mail, Stephen Grove of BB&T wrote;

> I spoke to Ken Barton briefly outside following his meeting with Bill Newbraugh and Dan Ryan's real estate agent. Dan Ryan is offering $12,000 per acre which translates to $4,044,000 for 337 acres. Dan wants a 90 day due diligence period which would terminate at the end of February, and he would pay cash at settlement on April 1, 2004 if all goes well. Bill Newbraugh's role would be to act as Dan's Project Manager. . . Chafford Industries of Charles Town has $5,100,000 contingent on obtaining final plat approval. They would pay $2,600,000 at settlement . . . and require owner financing with a deed of trust @6% probably until the lots are sold.

38.    Upon information and belief, on December 5, 2003, Attorney Barton mailed a letter to Stephen S. Grove of BB&T wherein he confirmed that Herbert Jonkers of the "Chafford Group" was interested in purchasing the Yoe Farm along with Dan Ryan Builders.

39.    Upon information and belief, on or before December 31, 2003 Day Ryan Builders, Inc. tentatively agreed to buy the Yoe Farm for a sales price of Four Million Five Hundred Thirty Six Thousand Dollars and Zero Cents ($4,536,000.00), cash in hand.

40.    On February 17, 2004, Robert Hill notified the Beneficiaries that Dan Ryan Builders would not purchase the Yoe Farm because "another parcel of land that the Dan Ryan people

believed was critical to their purchase" was not acquired.  Executor Hill learned that Dan Ryan was no longer interested in the Yoe Farm through BB&T officials, and upon information and belief, did not independently confirm that Dan Ryan Builders had withdrawn its offer.  Hill wrote, "[a]s a result, Harry's attorney, Ken Barton, is drawing up another contract for the next buyer at this time."

41.     Upon information Attorney Barton attempted to steer BB&T toward the Butler Group after the Dan Ryan Builders' deal collapsed.  Upon information and belief, the Butler Group had offered Harry W. Yoe Four Million Five Hundred Thousand Dollars ($4,500,000.00) to buy the Yoe Farm prior to his death.   Stephen Grove of BB&T, however, insisted that Herbert Jonkers was wishing to purchase the Yoe Farm.

42.     Upon information and belief, BB&T informed Executed Hill that it had checked into Herbert Jonkers' financial affairs and found him to be a "sound' borrower.  Upon information and belief, BB&T advised Executor Hill that Herbert Jonkers had been in the development business for over twenty years. BB&T, however, failed to disclose that Jonkers and his related entities had been through, upon information and belief, several bankruptcy proceedings during that same twenty-year-time period.  BB&T also failed to inform the Beneficiaries that BB&T had existing loans with another entity owned by Defendant Jonkers.

43.     Executor Hill and the Beneficiaries relied upon the representations of the banking professionals concerning the credit worthiness of Herbert Jonkers and his related companies, and believed that the process that was used to determine his credit worthiness was valid and commercially reasonable.   The Beneficiaries also relied upon BB&T to perform a legitimate credit inquiry of Herbert Jonkers that was not fraudulent and believed that the bank was obtaining legitimate appraisals to support its lending decisions.

44.     On or about March 2, 2004, Executor Hill, in reliance upon the representations and assurances made by BB&T, and in his capacity as the Executor of the Estate agreed to sell the Yoe Farm through an Agreement for the Purchase and Sale of Real Property to Herbert Jonkers and his soon-to-be-created company, Yoe Properties, LLC.  As was indicated before, the agreed upon sales price of the Yoe Farm was Five Million One Hundred Thousand Dollars and Zero Cents ($5,100,000.00).  Pursuant to the terms of the Agreement, the sales price would be paid with both cash and seller financing.  Specifically, Yoe Properties, LLC agreed to pay cash in an amount necessary for the Yoe Estate to pay all estate taxes due and owing, with the balance payable by a promissory note, and secured by a deed of trust.  In the Agreement, Executor Hill agreed to accept a second deed of trust on Parcel 18.1, and a first deed of trust on Parcels 18.2 and 18.3.

45.     The Contract was signed by Executor Hill and Herbert Jonkers, on behalf of the not-yet created limited liability company, Yoe Properties, LLC.

46.     After the contract was entered into, BB&T contracted to have another appraisal of the Yoe Farm performed.  Upon information and belief, the appraisal was ordered because BB&T had been and was planning to loan Herbert Jonkers money in an amount sufficient to cover Estate Taxes.

47.     On March 26, 2004, C&L Group, Inc. wrote BB&T and advised that the market value of the Yoe Farm was Five Million Fifty Thousand Dollars and Zero Cents ($5,050,000).  According to the Bank's Second Appraisal, the property value of the Yoe Farm had risen by Two Million Dollars in only seven months.    Upon information and belief, this higher valued appraisal was necessary to meet BB&T's lending criteria.

48.     On March 29, 2004, three days after the new appraisal was received Stephen Grove of BB&T wrote and admitted that it was "lowballing the estate tax."  Grove wrote, "Using the

original appraised amount for the real estate ($3,000,000), the tax should be about $804,000." Even though the "lowball[ed]" appraisal was almost identical to the probate amount listed on the July 21, 2003 Schedule of Fees, the Beneficiaries were unaware that the Bank had "lowball[ed]" the initial appraisal of the Yoe Farm.

49.    On April 1, 2004, Executor Hill met with BB&T officials.  At that meeting, Executor Hill was advised that BB&T would be lending Herbert Jonkers the money to cover the estate taxes but was checking with BB&T officials in Charleston, West Virginia to ensure that it could proceed in "dual-roles" as co-executors and lenders.  Upon information and belief, Executor Hill was not advised of additional loans between BB&T and Herbert Jonkers at that time.  Also, the Beneficiaries were not advised of the Bank's reservations about proceeding in dual roles.

50.    On April 6, 2004, only five days before the closing on the Yoe Property, Attorney Barton mailed a letter to Robert Hill wherein he stated,

> I was contacted this past week by Tim Procita, business service officer at BB&T, regarding settlement of the Yoe Farm.  As you will recall, when we first discussed the details with Herb Jonkers, Tim and others, the plan was for the estate to have a first deed of trust on one of the parcels, with BB&T having a second.  As to the other tracts, BB&T would have a first.  Upon the final closing, the scenarios would be that the estate would hold a second deed of trust on the later two properties.  As part of the loan requirements, the bank is requiring that it be in the first position over all of the tracts.  While on the one hand, it is always preferred to be in the priority lien position so that in the event of a default, the first lienholder would be paid first, at the same time, the property is appraised for such an amount that both the first and second deeds of trusts are, in my opinion, fully secure.  Thus, in my view, I do not think that the estate is risking anything by agreeing to be in the second position over all of the land.  In light of the fact that estate taxes are going to need to be paid shortly, it is still my view that this is an excellent transaction for the estate ("Excellent Transaction Letter")

Case 3:13-cv-00173-GMG   Document 1   Filed 12/02/13   Page 11 of 35   PageID #: 11

51.     Upon information and belief, BB&T did not advise Attorney Barton that it was lending additional money to Herbert Jonkers, nor did it advise him of its unreasonably defective inquiry into Defendant Jonkers' credit worthiness.  BB&T thus obtained this legal advice through providing false information.

52.     The Beneficiaries were never provided a copy of the aforementioned Letter nor told of its contents prior to the April 12, 2004 closing.  The Beneficiaries were thus not informed that the Bank would be reshuffling the lien positions of the parties prior to the closing on the Yoe Farm and moving the estate into the "second position".

53.     Upon information and belief, Attorney Barton was referencing the March 29, 2004 appraisal when advising Executor Hill that the property was appraised at an amount to make the property "fully secure".

54.     Upon information and belief, on April 6, 2004, BB&T's Stephen Grove wrote Attorney Barton and Executor Hill and stated that he was optimistic that the "terms of the loan will change in favor of the estate.  Tim Procita is awaiting final approval to allow the estate to share a first deed of trust with the bank for two of the parcels."   Upon information and belief, BB&T concealed this information from the Beneficiaries.

55.     Upon information and belief, Executor Hill relied upon the advice of the banking and legal professionals when allowing the bank to reshuffle the lien positioning on the Yoe Farm to give BB&T the first lien position.

56.     On or about April 12, 2004, Executor Hill, in his capacity as the Executor of the Estate of Harry W. Yoe, sold the Yoe Farm to Yoe Properties, LLC, for consideration in the amount of Five Million One Hundred Thousand Dollars and Zero Cents ($5,100,000.00).  At the closing on April 12, 2003, Executor Hill transferred title to the Yoe Farm to Yoe Properties LLC.

57.     Yoe Properties, LLC financed the cash portion of the purchase price for the Real Property with a loan from BB&T in the amount of One Million and One Hundred Thousand Dollars ($1,100,000.00), Yoe Farm Loan Number 9570145700-00001.  The note was secured by Credit Line Deed of Trust and Security Agreement recorded against the Real Property, which was recorded in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Trust Deed Book 1423, at Page 319. (First Deed of Trust). Upon information and belief, both the Estate's seller financing deal and the Bank's commercial loan were based upon faulty appraisals and lending practices that violated the Bank's own lending standards.  The loans were also made without a commercially reasonable investigation into the borrowing party's ability to repay the loans.

58.     The loan proceeds from the note secured by the First Deed of Trust were utilized by the Yoe Estate to pay federal and state estate taxes in the amounts of Eight Hundred and Five Thousand Dollars ($805,000.00), and Ninety Thousand Dollars ($90,000.00), respectively.

59.     The balance of the purchase price was seller financed by the Yoe Estate, through a promissory note in the amount of Four Million and Two Hundred Thousand Dollars ($4,200,000.00), which note was secured by a Deed of Trust recorded against the Real Property, and in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Trust Deed Book 1423, at Page 326 (Estate's Deed of Trust or Second Deed of Trust).

60.     The promissory note secured by the Second Deed of Trust provided that the principal loan amount would be payable to the Estate as follows:  One Million and Seven Hundred Thousand Dollars ($1,700,000.00), was due no later than eighteen (18) months after the execution of the note (October 12, 2005); and Two Million and Five Hundred Thousand Dollars ($2,500,000.00), was payable no later than forty-two (42) months after the execution of the note

(October 12, 2007).  Payments on the $2,500,000.00 were to begin accruing interest at 6 percent (6%) after the October 2005 payment to the Estate was made.

61.     At the direction of BB&T, BB&T, Executor Hill and Yoe Properties, LLC, also entered into a "Priority Agreement," which provided BB&T with a first deed of trust lien position on Parcel 18.1, and a shared first lien position on Parcels 18.2 and 18.3 with the Estate.  The Priority Agreement provided the Estate with a second deed of trust lien position on Parcel 18.1, and a shared first lien position with BB&T on Parcels 18.2 and 18.3.  Stephen Grove of BB&T had advised Executor Hill that the estate would be sharing a first deed of trust on two of the parcels, but that was only partially true.  Under the priority agreement, if the three parcels were sold collectively, BB&T was entitled to One Hundred Percent of the proceeds until its loan was fully paid back.

62.     The Priority Agreement protected BB&T's interest in the Real Property to the detriment of the Estate, even though BB&T was only loaning one/fifth of the amount that the Estate was Seller Financing.  Upon information and belief, BB&T's lending criteria would not have allowed it to seller finance four-fifths of the Yoe Farm deal.

63.     On or around May 11, 2004, Beneficiary Robert Yoe wrote Stephen Grove and asked, "what protection is there for the estate should the purchaser declare bankruptcy?  What will happen if the purchaser does not receive 'plat approval'?"

64.     Stephen Grove of BB&T responded by e-mail to Robert Yoe and assured him that the Jonkers/Yoe Properties deal was the best deal "by far".  Upon information and belief, in a May 11, 2004 e-mail Grove stated, "If the developer does not receive plat approval they are still obligated to pay us the balance owed, and if they forfeit payment we are ahead by $890,000 paid up front.  So, the bank and the estate are both in excellent position."  (emphasis added)  This statement

was objectively false and was knowingly transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing BB&T's scheme to defraud.

65.     At no point were the Beneficiaries advised that BB&T required the lien positioning to be reshuffled prior to the April 12, 2004 closing.

66.     Upon information and belief, after title to Yoe Properties was transferred, BB&T continued an illegal scheme to acquire the Yoe Farm along with other high-value Herbert Jonkers' Real Estate Properties though predatory lending practices and other forms of estate-servicing fraud.

67.     Specifically, upon information and belief, after title was transferred on the Yoe Farm, BB&T loaned in excess of Ten Million Dollars to non-creditworthy Herbert Jonkers' entities.  Among the Herbert Jonkers' Entities loaned to were Sheridan LLC, a West Virginia limited liability Company owned, in part, by Herbert Jonkers; Old Standard LLC, a West Virginia limited liability company owned, in part, by Herbert Jonkers, and Yoe Properties, LLC, a West Virginia limited liability company owned, in part, by Herbert Jonkers (collectively "Jonkers' Companies").  Upon information and belief, these loans were based upon sham appraisals, commercially deficient investigations and resulted from lending practices that violated the Bank's own lending standards.

68.     Upon information and belief, on August 27, 2003 BB&T extended a letter of credit to the Jefferson County Commission on behalf of Sheridan LLC, by a Demand Letter of Credit Note dated August 27, 2003 in the maximum principal sum of Two Million Seven Hundred Twenty Seven Thousand Seven Hundred Forty Three Dollars and Zero Cents ($2,727,743.00).    That loan was secured in part by 99 acres of Real Property located along Route 230 and U.S. 340, Harpers Ferry, Jefferson County, West Virginia ("Harpers Ferry Property").  Upon information and belief, this property was being developed by Herbert Jonkers under a contract with K. Hovnanian Homes

and had appraised at Eleven Million Dollars ($11,000,000) around the time the loan was made by BB&T on August 27, 2003.  Herbert Jonkers was a part owner of Sheridan LLC and served as a personal guarantor on the BB&T-Sheridan loan.

69.     Upon information and belief, on June 24, 2004 BB&T loaned Old Standard LLC One Million Four Hundred Thousand Dollars and Zero Cents ($1,400,000.00).   The purpose of this loan was to refinance existing Jonkers' debt with Central Bank secured by a 407.64 acre tract of land off of Bloomsbury Road in Jefferson County, Charlestown West Virginia ("Old Standard Quarry").  The loan was secured by a Deed of Trust on the Old Standard Quarry.  The Old Standard Quarry had appraised for Two Million Two Hundred Fifty Six Thousand Dollars and Zero Cents ($2,256,000.00).  As stated, Herbert Jonkers was a part owner of Old Standard LLC and served as personal guarantor on the BB&T loan.

70.     Upon information and belief, on September 7, 2004, BB&T loaned Sheridan, LLC, Eight Million One Hundred Thousand Dollars and Zero Cents ($8,100,000.00) to fund residential land development on the Harpers Ferry Property.  Upon information and belief, this property was being developed by Herbert Jonkers under a contract with K. Hovnanian Homes.  As stated, the Harpers Ferry Property appraised at Eleven Million Dollars ($11,000,000) around the time when the loan was made by BB&T on September 7, 2004.

71.     In total, BB&T had loaned Herbert Jonkers and his various shell entities in excess of Twelve Million Dollars before January 1, 2005.  Executor Hill and the Beneficiaries were not aware of the other loans to Jonkers' Companies and believed BB&T when it represented that Herbert Jonkers' financial history was "sound."   The Beneficiaries also believed that the Bank's recommendations concerning Jonkers' credit standing were based upon commercially reasonable lending practices.

72.     Upon information and belief, in early 2005, Herbert Jonkers and/or Yoe Properties requested BB&T to grant them a six month delay in making the first payment on the Yoe Estate's Deed of Trust.

73.     On or around June 8, 2005, Stephen Grove of BB&T informed Herbert Jonkers that BB&T was not interested in extending the payment date for the first note installment of One Million Seven Hundred Thousand Dollars ($1,700,000) due on October 12, 2005 for a period of six months.  Stephen Grove informed the Beneficiaries that the Bank did this because of the need to satisfy "tax liabilities, fiduciary fees and distributions to the Beneficiaries."   Stephen Grove's statement was objectively false.

74.     At that time, Stephen Grove of BB&T and Executor Hill informed the Beneficiaries of their refusal to extend the deadline, stating, "We feel no obligation to help them out since they own the property and will likely succeed in developing it given the current housing demand in our area.  The remaining funds will be held over to cover contingent liabilities and for other beneficiary distributions.  While Yoe Properties, LLC could default on the loan payment, this would be highly unlikely in our opinion, and we would stand to benefit."   This statement was objectively false.

75.     Stephen Grove of BB&T, through electronic mail, also falsely assured the Beneficiaries that Yoe Properties LLC would have to repay "us", referring to the Beneficiaries and the Bank collectively, in full to convey title to the property and discouraged them from undertaking efforts to repossess the property.   That statement was objectively false and Stephen Grove, upon information and belief, intended to mislead the Beneficiaries when making it.

76.     Upon information and belief Stephen Grove also advised the Beneficiaries that BB&T felt no need or obligation to "help them out" when referring to Jonkers and Yoe Properties

even though he knew that BB&T had helped Herbert Jonkers and his shell entities out by loaning them in excess of Ten Million Dollars in 2003 and 2004.

77.     On or about June 13, 2005, Yoe Properties, LLC, borrowed the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00), from K. Hovnanian Homes of West Virginia, L.L.C.  A note was secured by a Deed of Trust against the Yoe Farm, and recorded in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Trust Deed Book 1677, at Page 175 (Third Deed of Trust).  None of the proceeds from that sale were sent to the Beneficiaries or applied to debt on the Yoe Farm loan.  Upon information and belief, BB&T knew of this loan before lending additional money and requiring a second Subordination Agreement be entered into by the Estate.

78.     Upon information and belief, proceeds from the Third Deed of Trust were applied to the principal balances of the Jonkers'-Sheridan loan at BB&T or, in the alternative, were used to pay other past-due Jonkers' financial obligations.  BB&T was fully aware of the financial trouble of Herbert Jonkers when that loan was made.

79.     Upon information and belief, BB&T had not yet acquired priority lien positions over all of the Jonker's properties when it refused to grant Herbert Jonkers and Yoe Properties, LLC additional time on the first payment.

80.     Upon information and belief, BB&T chose to lend Herbert Jonkers and Yoe Properties an additional One Million Seven Hundred Thousand Dollars and Zero Cents ($1,700,000.00), Yoe Farm Loan Number 9570145700-00002, even though commercially reasonable lending practices should have prevented it from lending them additional money.

81.     Upon information and belief, by lending additional money, BB&T was able to maneuver itself into an even more secure position with the Yoe Farm and other Herbert Jonkers'

properties, mainly by forcing the Estate Executor into signing a Consent and Subordination Agreement.

82.     A Consent and Subordination agreement was necessary because BB&T, by its own underwriting or lending standards, could not lend additional money on property that was appraised at the same amount of the existing debt.

83.     Upon information and belief, on September 28, 2005, Tim Procita of BB&T wrote Stephen Grove and stated "I have a loan approved to lend an additional $1.7MM to Herb to make his payment due to the Yoe Estate.  I need to know that you will agree to the following:  I need my debt to have a priority lien on Parcels 1 & 3.  You can continue to have a priority lien on Parcel 2 (we will have a second and third lien on Parcel 3).  This means that you will need to sign a subordination agreement, subordinating your lien on Parcel 1 & 3 at the loan closing." This statement was false.  This e-mail was also concealed from the Beneficiaries.

84.     Upon information and belief, Rodney Frye of BB&T responded, "Steve will meet with Rob Hill, the executor, tomorrow to gain his approval of the plan."

85.     At the direction of BB&T, Executor Hill executed a Consent and Subordination agreement before the October 11, 2005 loan was made, in which the Estate subordinated its Second Deed of Trust to BB&T's Fourth Deed of Trust.  Executor Hill was unaware of the other Jonkers' loans when he signed the Agreement, and further unaware of the reasons a separate Subordination Agreement needing to be signed.

86.     The Consent and Subordination agreement benefited BB&T to the detriment of the Estate.

87.     Executor Hill described his signing of the Consent and Subordination Agreement as follows;

I received a call advising me that there was a document at the Trust Office for me to sign. When I arrived, I was advised that the document was on Mr. Keesecker's desk, so I went in and read it. I was struck by the fact that there was no one around at the time. And under the impression that getting the loan would facilitate Jonkers being able to make his payments to the estate. I went ahead and signed the document. Looking back on that event, I find myself wondering if Mr. Keeseker had been directed not be present for the signing, but, whatever the reason, he was not there. Due to my confidence in Mr. Keesecker's professionalism, I signed the document with the basic understanding, as I said, that it would facilitate payment by the estate by Mr. Jonkers. As a professional, one is expected to provide services. As a Trust Officer, I believe there is an obligation to insure that the client, in this case, the co-executor understands the ramifications of his actions. In looking back, I would have felt much more comfortable had the Trust Officer been present in order to facilitate understanding and answer any questions. I believe such action would also allay any concerns regarding conflict of interest, as I was working with the Trust Department on a document drawn up by the Loan Department, and each department has its respective responsibilities. Also, in looking back, there appears that is want not always clear to everyone that, as executor, I had contracted for Trust services and not Wealth Management service. I do not believe, however, that there was ever any doubt on the part of Mr. Keesecker.

88.     Upon information and belief, the phone message to Executor Hill asking him to sign the Consent and Subordination Agreement was knowingly transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing a scheme to defraud.

89.     On or about October 11, 2005, BB&T officially loaned One Million Seven Hundred Thousand Dollars and Zero Cents ($1,700,000.00) to Yoe Properties, LLC and Herbert Jonkers. A note was secured by a Credit Line Deed of Trust and Security Agreement against the Real Property, and recorded in the Office of the Clerk of the County Commission of Berkeley County, West Virginia, in Trust Deed Book 1776, at Page 455 (Fourth Deed of Trust).

90.     The loan proceeds from the note secured by the Fourth Deed of Trust were utilized by Yoe Properties, LLC, to make the initial payment of One Million Seven Hundred Thousand

Dollars ($1,700,000.00), to the Estate's Account pursuant to the promissory note secured by the Second Deed of Trust. However, only a portion of that amount was actually distributed to the Beneficiaries.

91.     Upon information and belief, upon receipt of those funds, BB&T distributed Nine Hundred Forty Two Thousand Three Hundred Twenty Nine Dollars and Two Cents ($942,329.02) to the Beneficiaries in October, 2005. BB&T also paid Executor Hill and itself a fee of One Hundred Fifty Four Thousand Seven Hundred and Sixty Eight Dollars ($154,768.00) for their work as "co-executors", an amount identical to what was predicted on the July 21, 2003 Schedule of Fees.

92.     A few days later, K. Hovnanian Homes of West Virginia, L.L.C., executed a Consent and Subordination agreement on October 14, 2005, and agreed to subordinate the Third Deed of Trust to the Fourth Deed of Trust. The Beneficiaries were never advised that K. Hovnanian Homes was acquiring a Deed of Trust secured by the Yoe Farm, and were further unaware that it subsequently reshuffled the lien positioning through a subordination agreement.

93.     Upon information and belief, a distribution of Two Hundred Seventy Thousand Dollars and Zero Cents ($270,000.00) was made to Robert Yoe on January 4, 2007.

94.     Upon information and belief, BB&T made three distributions to the Beneficiaries on May 2, 2006, October 18, 2006, and April 30, 2007, each totaling Seventy Five Thousand Dollars ($75,000.00.) Those distributions were purported to have resulted from the receipt of interest payments made to the Estate Account by Herbert Jonkers.

95.     Upon information and belief, BB&T used the interest payment-distributions to mislead the Beneficiaries into thinking that the Estate was being properly administered by BB&T and Executor Hill. The e-mails and letters accompanying the Interest Payment distributions were

knowingly transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing BB&T's scheme to defraud.

96.     Interest payment distributions stopped being made to the Yoe Estate in October 2007. Additionally, Herbert Jonkers and Yoe Properties LLC defaulted on their obligation to pay the Yoe Estate the remainder of the Two Million Five Hundred Thousand Dollar ($2,500,000.00) Balance that it still owed Yoe Estate.

97.     Upon information and belief, Herbert Jonkers stayed current with his interest payments on the two separate BB&T loans, Yoe Farm Loan Number 9570145700-00001 and Yoe Farm Loan Number 9570145700-00002.

98.     On February 2, 2008, Beneficiary Robert Yoe wrote Martin Keesecker of BB&T and asked, "Has there been any action on Jonkers?  If necessary I will pay for any additional costs (i.e. property taxes) if we have to foreclose, (I think we should foreclose and put it back on the market). Thanks for your help Bob Yoe."

99.     Upon information and belief, on April 14, 2008, Rodney Frye from BB&T wrote Attorney Barton and asked him to craft a response to Robert Yoe.  Upon information and belief, BB&T concealed and/or hid pertinent information from Attorney Barton and otherwise misled him prior to his drafting of a several-page letter to the Beneficiaries.  Among other things, BB&T concealed from Attorney Barton the negotiation and creation of a separate Subordination Agreement further reshuffling the lien positions and the identify of various other loans between BB&T and Herbert Jonkers, and the other assets of his that it was pursuing..

100.    BB&T's Rodney Frye wrote,

> I will forward an inquiry from Bob Yoe on our status with regard to the outstanding note owed by Herb Jonkers.  In light of the passage of time, the current status of the market, and Mr. Jonkers capacity to

> pay, I would like for you to craft a letter to respond to Bob's e-mail questions.   The key question appears to be- - Was it appropriate for the executor to subordinate the estate's position in October 2007 in order to receive the $1,700,000 payment that was then due?  . . . the bank required it[]s first lien position on part of the property to get the bank to do Herb's loan.  That bought Herb another year to try to sell all or part of the project and gave the estate a little over half of the original sale price.  Please reflect on these issues and help us give Rob Hill an answer to Bob Yoe's questions.

101.    On April 15, 2008, Executor Hill, and Martin Keesecker, a Trust Officer with BB&T met with Robert Yoe in the offices of BB&T in Martinsburg, West Virginia.   Rodney Frye, the Vice President in charge of the Trust Department at BB&T was present by telephone from Virginia.  The conversations during the meeting were transmitted by wire in interstate commerce for the purpose of executing a scheme to defraud.

102.    At the April 15, 2008 meeting, BB&T officials met with Robert Yoe and summarized Executor Hill's actions in signing the priority and subordination agreement and explained that Executor had no other choice but to sign it.  BB&T officials also explained that it would be to the Estate's detriment to force a foreclosure on the property at that time because BB&T and K. Hovnanian Homes of West Virginia, LLC held secure title above the Yoe Estate.   That statement was objectively false.

103.    In a letter summarizing the April 15, 2008 meeting, Attorney Kenneth Barton wrote,

> I understand that Yoe Properties remains current on its loan to BB&T. In my opinion, the worst thing that could happen for the Estate were for Yoe Properties to default on the loans to BB&T and for BB&T to then foreclose. This would put the Estate in a rather untenable situation since it would have to either satisfy BB&T or have its lien wiped out entirely at the foreclosure sale. The reason for concern is that subordinate lien holders lose their lien if the property is sold at auction.  If the sale brings enough to pay the senior lien holder and there is something left over, then the subordinate lien holders can be paid.  However, I am not certain that in the current market climate and given the location of the project that a sale would

bring enough to pay everyone off. In my view, in order for the Estate to be certain that it would be made whole, the sale would have to bring Seven Million Eight Hundred Thousand and Eight Hundred Thousand Dollars ($7,800,000.00). Even though there have been five hundred and ninety-five (595) lots approved by the Berkeley County Planning Commission and there are another three hundred and sixty-six (366) fully ready for submission to the Planning Commission, I do not see any local builders willing to take on that kind of debt in this market.

104.   Upon information and belief, relevant information was concealed from Attorney Barton by BB&T thereby influencing his legal analysis and allowing incorrect information to be transmitted to the Beneficiaries.   BB&T also ratified his statements knowing that false information had been transmitted.

105.   At no point during the April 15, 2008 meeting were the other Herbert Jonkers' loans or properties mentioned even though repayment of the Sheridan Loan, Yoe Properties Loan, and Old Standard Loan were, upon information and belief, the subject of contemporaneous negotiations between Herbert Jonkers and BB&T.

106.   On or about June 26, 2008, BB&T entered into a Forbearance Agreement with Herbert Jonkers, Old Standard LLC, Sheridan LLC and Yoe Properties.   In that Agreement, all five separate Jonkers-BB&T loans were rolled into a single Forbearance Agreement. Pursuant to the Forbearance Agreement, BB&T loaned Herbert Jonkers an additional Two Million Dollars in exchange for higher, more secure lien positioning. Upon information and belief, the Fifth Deed of Trust positioned BB&T above K. Hovnanian Homes of West Virginia, LLC on the 99 acres of property located along Route 230 and US 340, Harpers Ferry, Jefferson County, West Virginia (Harpers Ferry Property).

107.   BB&T also recorded another Credit Line Deed of Trust and Security Agreement in the amount of Seventeen Million Forty Two Thousand Six Hundred and Sixteen Dollars

($17,042,616.00), against the Real Property for prior loans made to Herbert Jonkers, Yoe Properties, LLC, Old Standard, LLC and Sheridan LLC (Fifth Deed of Trust). Upon information and belief, when the Fifth Deed of Trust was recorded, only the BB&T-Sheridan Loan of Eight Million One Hundred Thousand Dollars ($8,100,000.00) showed amounts reduced from the principal. BB&T concealed from the Beneficiaries that it had recorded this Credit Line Deed of Trust.

108.   Upon information and belief, the Properties securing the Fifth Deed of Trust were appraised at Eleven Million Dollars and Zero Cents, ($11,000,000.00), Two Million Two Hundred Fifty Six Thousand Dollars ($2,256,000.00) and Five Million Fifty Thousand Dollars ($5,050,000.00) for a total value of Eighteen Million Three Hundred and Six Thousand Dollars and Zero Cents ($18,306,000). At the time the Fifth Deed of Trust was recorded, no principal payments on either of the BB&T-Yoe Properties' Loans, Yoe Farm Loan Number 9570145700-00001 or Yoe Farm Loan Number 9570145700-00002 had been collected.

109.   Upon information and belief, on March 16, 2009 the principal balance owed to BB&T on Loan 9570145700-00001 was One Million One Hundred Thousand Dollars and Zero Cents ($1,100,000.00), and the principal balance owed on Loan 9570145700-00002 was One Million Seven Hundred Thousand Dollars and Zero Cents ($1,700,000.00).

110.   In a June 9, 2009 e-mail, the Beneficiaries were again discouraged by BB&T agents from filing a lawsuit, and advised that it was not in "the Estate's best interest to incur the legal expense bringing suit against Yoe Properties, LLC. While the Estate can probably obtain a judgment, unless it is able to 'pierce the LLC's veil' and reach the assets of the members, recovery of any money for the estate is doubtful." BB&T ratified those statements.

111.    Upon information and belief, it was unknown to Executor Hill, the Beneficiaries , and Attorney Barton that BB&T was maneuvering into a position where it could obtain judgments against Herbert Jonkers and the entities he was involved with while discouraging the Beneficiaries from engaging in that same activity.   BB&T concealed that information from Attorney Barton.

112.    BB&T had already rolled the debts of Herbert Jonkers, Sheridan, Yoe Properties, and Old Standard into a single forbearance agreement when the Beneficiaries were finally advised that it was not "in the Estate's best interest to incur the legal expense bringing suit against Yoe Properties, LLC "because of veil piercing barriers."

113.    From late 2007 to early 2010, the Beneficiaries were repeatedly advised by BB&T through e-mail correspondence and phone conversations that Herbert Jonkers was refinancing and/or loaning money and that the best move was to stand-by until 1) an arbitration concluded; 2) lenders provided the capital for Jonkers to pay-off the notes; or 3) to simply wait for the market to cycle back to positive territory.  That advice was knowingly transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing a scheme to defraud.

114.    Officials from BB&T, either directly or through its agents also repeatedly advised the Beneficiaries that foreclosure was the worst possible outcome.  Those communications were knowingly transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing BB&T's scheme to defraud and were ratified by BB&T.

115.    On or about June 16, 2010, upon information and belief, BB&T had positioned itself into "first" position on all of the Jonkers' Properties and loan payments on the latest applicable Forbearance Agreements were past due.  At that point, the Beneficiaries were advised, "Reading between the lines, I think that the chance for any further payment on the Note due to you and the other heirs is bleak."

116.    On December 3, 2010, the Beneficiaries filed a lawsuit in Circuit Court of Berkeley County, West Virginia against BB&T, Herbert Jonkers, Yoe Properties LLC, and Executor Hill, captioned Robert Yoe, et al. v. Branch Banking and Trust Company, et al, Civil Action No. 10-C-986.  In the lawsuit, the Beneficiaries alleged that BB&T and Executor Hill had breached fiduciary duties and committed negligence in the administration of the Yoe Estate.

117.    Attorney Barton filed an Answer on behalf of Defendant, Executor Hill.    Upon information and belief, BB&T used estate funds to pay Attorney Barton to represent Executor Hill in the state court lawsuit.  Upon information and belief, Attorney Barton nor Executor Hill were aware that the Bank was using estate funds to pay for Executor Hill's legal representation.

118.    On January 11, 2011, BB&T, through counsel Rosenberg Martin & Greenberg LLP, filed a Motion to Dismiss the State Court Action wherein it argued that BB&T was "never appointed as a fiduciary" and was not "recognized as an executor or administrator of the estate" and thus had "no duty to Plaintiffs."  BB&T also argued in its Motion to Dismiss that the Beneficiaries' claims against it were barred by the two year statute of limitations.  Those statements were in direct contradiction to the earlier representations made by Steve Grove and ignored that BB&T had paid itself commissioned fees that are only allowed to be paid to estate executors under West Virginia law.

119.    In the Motion to Dismiss, Counsel for BB&T stated, "the Complaint was filed on December 3, 2010. . . Here the allegations made in the Complaint clearly illustrate that by October 2007, the Plaintiffs were aware that Yoe Properties was not paying on either the loan by the Estate or by BB&T.  Because the liens, Priority Agreement and Consent and Subordination Agreement are all recorded documents, as early as April 2004 or as late as October, the Plaintiffs had constructive knowledge of the events giving rise to their cause of action for negligence."  The Motion to

Dismiss was caused by BB&T to be transmitted by mail in interstate commerce for the purpose of executing BB&T's scheme to defraud in that BB&T secretively used Estate Funds to pay for the drafting and filing of the Motion.

120.   Oral arguments were presented on the Motion to Dismiss on or around March 4, 2011 and the Circuit Court of Berkeley County, West Virginia took the Motion to Dismiss under advisement.   After the hearing on the Motion to Dismiss, Attorney Barton presented an offer to counsel for the Beneficiaries of Two Hundred and Fifty Thousand Dollars ($250,000.00) to settle all claims against Executor Hill.   Upon information and belief, Executor Hill did not authorize or offer to pay that amount to settle the claims.   Upon information and belief, BB&T was the funding source behind that offer of settlement.

121.   On April 7, 2011, the Circuit Court of Berkeley County, West Virginia granted BB&T's Motion to Dismiss finding that BB&T owed no fiduciary obligations or duties to the Beneficiaries and that the Beneficiaries were not third party Beneficiaries as defined by West Virginia statute.   The Berkeley County Circuit Court also found that the stature of limitations had run on the Beneficiaries' negligence claims against the Bank.

122.   The Beneficiaries proceeded on with their lawsuit against Executor Hill, including scheduling and taking Executor Hill's discovery deposition, subpoenaing documents from BB&T, and compelling Executor Hill to produce all of the estate documents within his possession.

123.   On August 14, 2012, Defendant Hill filed his Answers and Responses to the Plaintiffs' First Set of Discovery in the state court action.   When responding, Defendant Hill attached approximately one thousand documents related to his administration of the Yoe Estate, including dozens of previously unseen e-mails and/or letters between BB&T, Executor Hill, and Attorney Barton. Included in the letters was the April 6, 2004 Excellent Transaction Letter.

Defendant Hill also produced over a hundred pages from the BB&T Account History for the account of Harry Yoe.  The production demonstrated that Executor Hill, however, was not in possession of the various forbearance agreements, appraisals and loan agreements between the Bank and Herbert Jonkers.

124.    The BB&T Account History also demonstrated that Attorney Barton's law firm has been getting paid by BB&T using estate funds under two separate invoice numbers, Yoe Properties S&J No 995750.00001 file and Harry Yoe Estate S&J No. 412290.00001 file.  The payments to Attorney Barton's law firm included payments for activities undertaken by Attorney Barton to represent Executor Hill in defending the lawsuit brought by the Beneficiaries.   Upon information and belief, BB&T chose to pay for these services using Estate funds, even though they had no authorization to do so under West Virginia law.

125.    Additionally, documents produced by Executor Hill demonstrated that an attorney fee in excess of Twenty Thousand Dollars was authorized for payment from the Estate Account to Rosenberg Martin & Greenberg LLP in 2012.   Upon information and belief, the only work that Rosenberg Martin & Greenberg appears to have performed was to draft and argue a Motion to Dismiss.

126.    When Executor Hill was deposed, he was unaware a) that a Motion to Dismiss had been filed in Berkeley County Circuit Court, and b) that BB&T had been dismissed from the lawsuit. He was also unaware of who was paying Attorney Barton to defend him in the lawsuit brought by the Beneficiaries in Berkeley County Circuit Court.

127.    Upon information and belief, Executor Hill did not authorize the payment to Rosenberg Martin & Greenberg, nor did he authorize payments from estate funds for his legal

defense in the state court action.  Upon information and belief, BB&T directed estate funds to be used for those activities.

128.   On or about June 1, 2012, the Beneficiaries also forced BB&T to produce relevant documents by subpoena.  The documents produced by BB&T included appraisal reports, loan applications, modification agreements and forbearance contracts between the Bank and various Jonkers' Entities.  Upon information and belief, Executor Hill did not have those documents before the lawsuit was filed.

129.   Upon information and belief, the subpoenaed documents showed that on March 20, 2012, the balances owed on Yoe Farm Loan Number 9570145700-00001 and Yoe Farm Loan Number 9570145700-00002 were Six Hundred Fifty Nine Thousand Four Hundred Eighty Eight Dollar and Sixty One Cents ($659,488.61) and One Million Nineteen Thousand Two Hundred Nine Dollars and Sixty Eight Cents ($1,019,209.68) for a total of $1,678,698.36.  The subpoenaed documents thus demonstrated that in excess of One Million Dollars had been reduced from the principal on the two Yoe Farm's loans after March 16, 2009.  Zero amounts were distributed by BB&T to the Beneficiaries after March 16, 2009.

130.   Upon information and belief, the reduction in principal on the two Yoe Farm loans occurred after it became clear that the rights to the Yoe Farm were going to end up in litigation and BB&T had made a decision to dump the property.  Although BB&T was providing zero services to the Estate at that point, BB&T continued using the funds in Harry W. Yoe's accounts at its own discretion.

131.   Upon information and belief, as of March 20, 2012, BB&T had collected Five Hundred One Thousand Three Hundred Fifty Eight Dollars and Thirty Four Cents ($501,358.34) in interest on Yoe Farm Loan Number 9570145700-00002.  The amount of interest collected on Yoe

Farm Loan Number 9570145700-00001 is unknown.   The amounts collected by BB&T on interest in the other Jonkers loans are also currently unknown.

132.    Prior to dumping the Yoe Farm, BB&T performed a Loan Loss Analysis and requested a Five Hundred Thousand Dollar ($500,000.00) write-down of the "Yoe Properties Note 2." In the Analysis, it was noted that a September 26, 2011 loan appraisal determined the Yoe Farm to have a value of "2,060M" and noted that "throughout the years the value of the property declined."

133.    The Yoe Farm had been appraised for BB&T by CL Group on November 16, 2009, and the CL Group had concluded that the property was worth Five Million Fifty Dollars and Zero Cents ($5,050,000.00).   Upon information and belief, BB&T had once again "lowballed" an appraisal to serve its own purposes.

134.    On May 9, 2012, the Yoe Farm was sold at a public auction to the highest bidder for Nine Hundred Ten Thousand Dollars and Zero Cents ($910,000.00).  The sales proceeds from that auction were paid to BB&T.  The Beneficiaries received nothing.

135.    At all relevant times, Executor Hill acted with gross negligence in the administration of the Yoe Estate.

## COUNT I: CIVIL RICO

136.     The Plaintiffs re-allege and incorporate the allegations set forth in Paragraphs 1 through 135 as though they were fully set forth herein.

137.    BB&T constitutes an enterprise engaged in or the activities of which affect interstate commerce for purposes of 18 U.S.C. § 1962(c).

138.    The BB&T employees mentioned herein, including Stephen Grove, Rodney Frye, Martin Keesecker, and Tim Procita were at all relevant times employed by or associated with

BB&T and directly conducted and participated in the business and affairs of BB&T through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

139.     BB&T, of its own accord, and by and through its attorney agents, devised and implemented a loan servicing and estate services scheme to defraud the Beneficiaries, and/or to obtain money and property by false pretenses through misrepresentation, concealment, and manipulation of lending and estate servicing practices.

140.     In furtherance of this scheme, upon information and belief, BB&T repeatedly used or caused their agents to use the mails and wires, to represent to the Beneficiaries that a) BB&T was acting with Executor Hill in pursuing the best interests of the Estate; b) BB&T and the Estate were equally secured in the Yoe Farm deal; c) in the event of a default the Estate could take back the Yoe Farm; d) that the Beneficiaries would stand to benefit if Yoe Properties LLC and/or Defendant Jonkers defaulted on their obligations to pay the Estate; and e) that BB&T employed commercially reasonable lending principals and processes prior to making estate-related recommendations to Executor Hill and the Beneficiaries.  BB&T also used the mails and wires to fraudulently a) purchase time to negotiate the June 26, 2008 Forbearance Agreement, obtain judgments against Jonkers' entities, and reduce principal on its own Yoe Farm loans; b) manipulate their own underwriting standards by basing loans upon sham appraisals, c) wrongfully advise the Beneficiaries concerning lien positioning and veil piercing possibilities; and d) paying for and controlling the attorneys defending the Estate Executor and it in a lawsuit alleging breach of fiduciary duties for the benefit of the Bank.

141.     Each of the acts referred to in Paragraphs 140 constitutes a violation of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) and is therefore a predicate act of racketeering activity under 18 U.S.C. § 1961(1).  These predicate acts are related in that they shared the same or

similar purposes, results, participants, victims, methods of commission and were otherwise interrelated by distinguishing characteristics and were not isolated events.   Specifically, each predicate act was committed in furtherance of BB&T's scheme to gain trust, manipulate, mislead, and finally steal vested property and money from the Plaintiffs.   The predicate acts were not isolated events, but rather regular and integral steps in furtherance of the BB&T's scheme to defraud the Plaintiffs

142.   BB&T officials specifically intended for the Beneficiaries to rely on their representations as it manipulated and maneuvered itself into a position to acquire high-value properties, commissioned executor fees, free attorney services, and hundreds of thousands of dollars in interest payments.   It was through these illegal lending and estate-servicing practices and/or other acts of fraud that allowed BB&T to steal vested property from Plaintiffs and later cover up the theft.

143.   Plaintiffs reasonably relied on the representations of BB&T officials, along with its agents, in the administration of Harry W. Yoe's Estate.   Further, the predicate acts were continuous in that they occurred on a regular basis since April 5, 2004, with the last predicate act occurring on March 20, 2012.

144.   Accordingly, the Defendant BB&T's criminal acts of mail and wire fraud constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

145.   BB&T's conduct toward the Plaintiffs was intentional, willful, wanton, malicious, and reckless and justifies an award of punitive damages.

## COUNT II:  COMMON LAW FRAUD

146.   The Plaintiffs re-allege and incorporate the allegations set forth in Paragraphs 1 through 145 above as though they were fully set forth herein.

147.    BB&T misled the Plaintiffs to believe that it was acting for the benefit of the Estate alongside Executor Hill; and that it had employed commercially reasonable lending practices when determining that Herbert Jonkers was a credit-worthy borrower.  BB&T also used fraudulent appraisals to support its lending decisions; proceeded in a situation where a conflict of interest should have precluded it from proceeding, advised the Beneficiaries that BB&T and the Estate were equally secured; represented that in the event of a default the Estate could take back the Yoe Farm; and/or assured the Beneficiaries that the Bank was following commercially reasonable steps in lending money and making recommendations to Executor Hill.  BB&T also advised the Beneficiaries that they would stand to benefit if Yoe Properties defaulted on its obligations to pay the Estate.

148.  BB&T concealed the Excellent Transaction Letter; concealed the lien positioning maneuvering on the Yoe Farm, concealed the other loans involving Herbert Jonkers, and/or concealed the various times that Herbert Jonkers demonstrated financial troubles.

149.    BB&T also led the Plaintiffs to believe that Herbert Jonkers was making interest payments to the Estate; misled the Plaintiffs in 2008 by having an attorney advise them to postpone legal proceedings; caused an attorney to incorrectly advise the Beneficiaries that K. Hovnanian Homes of West Virginia was in a superior lien position in 2008; concealed the June 26, 2008 Forbearance Agreement; and/or concealed that it was collecting interest payments on its own loans from Herbert Jonkers.  BB&T also used Estate funds to protects its legal interests after it was sued; concealed its efforts to obtain judgments against Herbert Jonkers; concealed that it was reducing principal on the two Yoe Farm loans; upon information and belief offered $250,000.00 to settle the matter without Executor Hill's authority and/or concealed that it was actively engaging in efforts to collect assets involving Herbert Jonkers' related companies.

150.   Each and every action described in Paragraph 147 through 149 constituted a separate act of common law fraud and was relied upon by the Beneficiaries.

151.   BB&T specifically intended the Plaintiffs to rely on the representations and concealments listed in Paragraph 147 through 149 in order to grant it the necessary time to maneuver itself into a more secure lien position, completely subordinate the Estate's interest, use the Yoe Farm as collateral in other maneuvering, collect hundreds of thousands of dollars in interest payments and commissioned executor fees, negotiate the June 26, 2008 Forbearance Agreement and otherwise obtain judgments against Herbert Jonkers and his related companies.

152.   The Plaintiffs reasonably relied on BB&T because they were banking professionals authorized to provide such services in the State of West Virginia and were being supervised, albeit negligently, by a trusted family friend and minister,

153.   As a proximate result of BB&T's intentional and fraudulent misrepresentations and concealments and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered damages in an amount equaling the difference between Five Million One Hundred Thousand Dollars and Zero Cents and the amounts actually distributed by BB&T to the Plaintiffs, along with unpaid interest on the Estate's Deeds of Trust.

WHEREFORE, Plaintiffs Robert B. Yoe, Paul Michael Yoe, Glenda Stuart, Jeanine Shoup, Joy Maynard, Jeffrey S. Yoe and James D. Yoe demand,

1.   Compensatory damages in an amount sufficient to fully compensate Plaintiffs for the damages and injuries sustained as a result of Defendant's unlawful conduct,

2.   Punitive damages against BB&T in an amount sufficient to deter the Defendant, BB&T and others from engaging in this conduct in the future;

34

3.    The court costs and attorneys' fees incurred by the Beneficiaries in the preparation and prosecution of this action;

4.    Treble damages and attorneys' fees pursuant to 18 U.S.C. 1964(c); and,

5.    Any and all other further relief the Court deems just and proper.

ROBERT B. YOE, PAUL MICHAEL YOE, GLENDA STUART, JEANNINE SHOUP, JOY MAYNARD, JEFFREY S. YOE and JAMES D. YOE,

By Counsel,

Todd R. Meadows, W. Va. Bar # 9770
Gianola, Barnum, Wigal & London, L.C.
1714 Mileground
Morgantown, WV  26505
(304) 291-6300